UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SHERRI L. YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:11CV1132 TIA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On December 17, 2008, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning October 1, 2008 due to neuropathy in both legs, chronic fatigue, malabsorption, low B12, sarcoidosis, memory fog, angina, irritable bowel, migraines, hypertension, constant shooting pains, burning sensations, and numbness in both legs. (Tr. 87, 130-31) Plaintiff's application was denied on January 31, 2009, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 86-90, 127) On January 8, 2010, Plaintiff appeared and testified at a hearing. (Tr. 23-85) In a decision dated February 22, 2010, the ALJ determined that Plaintiff had not been under a disability from October 1, 2008 through the date of the decision. (Tr. 8-17) The Appeals Council denied Plaintiff's Request for Review on April 26, 2011. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Plaintiff's attorney provided an opening statement regarding the theory of the case.  Counsel indicated that Plaintiff was a 47-year-old individual who suffers from serious impairments, emotionally, psychologically, mentally, and physically.  Plaintiff was taking 10 different prescription medications, along with 1000 milligrams of ibuprofen twice daily.  Plaintiff's treating physician, Dr. Cadiz, provided his opinion regarding Plaintiff's residual functional capacity ("RFC"), and records from Robin Patton substantiated Plaintiff's complaints of emotional and psychological impairments.  Counsel further stated that Plaintiff had consistently worked throughout her life, but her impairments took her out of the labor market.  In light of the records from Dr. Cadiz and Ms. Patton, as well as Plaintiff's testimony, counsel argued that Plaintiff was clearly unable to engage in any sort of substantial, gainful employment.  (Tr 31-33)

The ALJ then questioned the Plaintiff, who testified that she was born on November 24, 1962; measured 5 feet, 5 ½ inches tall; and weighed 220.  She had gained about 25 to 30 pounds since 2008, which she attributed to stress, inability to be physically active, and medication.  Plaintiff was married with two children, ages 23 and 18.  She lived in a one story home with a lower level.  She was able to walk down the stairs but had problems walking back up.  In addition, she had fallen down the stairs because her left leg and foot went numb, causing her to misstep.  She also experienced this while walking about once a month.  Plaintiff had a driver's license but did not drive very often.  Usually someone drove her places, although she only traveled a couple blocks from home.  Plaintiff attended college at Jefferson Junior College but did not earn a degree.  She also took classes at St. Louis University.  At the time of the hearing, Plaintiff did not work or volunteer her time.  She had

2

not sought unemployment benefits or worker's compensation.  Her husband worked, and she had health insurance through him.  Plaintiff received no public assistance or any other source of income. (Tr. 33-38)

Plaintiff was last employed on October 4, 2008 as a customer life-cycle management worker at Convergys.  She took phone calls from dissatisfied customers and tried to retain their business. Plaintiff left voluntarily because she was ill, and she was caring for her mother, who was diagnosed with cancer.  Plaintiff would visit her mother in the hospital and make decisions regarding treatment. She was unable to physically care for her mother.  Plaintiff also previously worked at Jefferson Memorial Hospital as a ward clerk and operational assistant.  These positions were part-time, and she worked both concurrently to have full-time employment.  As a ward clerk, her duties included making sure the forms were stocked, answering call lights to patients' rooms, sending in nurses, and directing family members to the correct rooms.  Plaintiff's job as an operational assistant entailed doing payroll, personnel documentation, and other clerical work.  She left that job to work for Convergys, which paid more.  (Tr. 38-40)

In addition, Plaintiff worked for American Roofing Exteriors as the office manager.  Her duties included payroll, accounts receivable, accounts payable, hiring and firing, and managing personnel.  This job lasted a little over a year.  Plaintiff left because her employer was losing income. Plaintiff also worked several different jobs through Workforce, a temporary agency, performing clerical work.  Other jobs included executive director at the De Soto Chamber of Commerce for two years; temporary clerical work at AA Mobile Home Sales; administrative assistant at Twin City Area Chamber of Commerce; administrative assistant at Carondelet Corporation; and administrative assistant at the YMCA.  (Tr. 40-46)

Plaintiff testified that she could no longer perform her past work as an administrative assistant because she was not physically capable.  She stated that during the day, she would get up, take a shower, lay down, get dressed, lay down again, then fix her hair.  Plaintiff explained that she was unable to tell an employer she could work Monday through Friday because she did not know whether she could work even one full eight-hour shift.  She described good days and bad days, but during a typical day, Plaintiff took 2 naps.  Plaintiff did not drink alcohol or use illegal drugs.  (Tr. 46-47)

Plaintiff's attorney also questioned the Plaintiff regarding her impairments.  Plaintiff stated that she left her job at Convergys because she was dealing with fatigue and leg pain.  She had to sit in the call center and was not allowed to walk and stretch her legs.  In addition, she had trouble remembering certain aspects of her job, and she was worried about her mother's illness, which caused problems with concentration.  Plaintiff testified that her past clerical jobs required concentration, memorization, and alertness.  Plaintiff's longest employment was from 1987 to 1994 at ABB-Combustion Engineering.  She had very little earnings in 1995 and 1996 because she had a tumor in her liver and had major surgery.  Her daughter was also struggling with asthma.  Other than those two years, Plaintiff was always employed through October of 2008.  (Tr. 48-51)

With regard to Plaintiff's physical complaints, she testified that her biggest complaint was pain.  She had pain in her feet, legs, arms, neck, and back.  Dr. Cadiz indicated that she suffered from neuropathy, which Plaintiff described as a "dying of the nerves."  Her symptoms included sharp, shooting pains in her legs, which sometimes felt as if she were walking on crushed glass.  In addition, her left leg and foot sometimes went numb.  On a scale of one to ten, Plaintiff rated the pain in her lower extremities as a 7 or 8 with medication.  On certain days without medication, Plaintiff's pain was a 10, and it shot from her leg down to her foot like an electrical current.  Plaintiff also stated that

4

Dr. Cadiz diagnosed fibromyalgia, which affected her arms, neck, and back.  She described the pain as a flu-like feeling where everything hurts and throbs sometimes.  Plaintiff experienced these symptoms every day, and the pain level was a 7 or 8 out of 10 with medication. (Tr. 51-55)

Plaintiff further testified that Dr. Cadiz also diagnosed sarcoidosis, which was a sister disease to Hodgkin's disease.  Plaintiff described it as an immune system disease that caused calcification on connective tissue, including Plaintiff's lungs.  With regard to mental impairments, Plaintiff stated that she dealt with anxiety attacks, tearfulness, and forgetfulness.  She felt like a burden on her family because she was unable to function.  Plaintiff was unable to balance a checkbook or understand what she was reading.  She stated that a B12 deficiency caused her memory problems.  On a couple occasions, she drove her car and could not remember how to get to her destination.  (Tr. 55-58)

Plaintiff opined that she could stand for 15 or 20 minutes before experiencing pain and fatigue, requiring her to sit down.  She could sit for 10 to 20 minutes but had to readjust and get up.  During the day, Plaintiff sat in a recliner with her feet up.  She did not lift and carry items; however, she could carry a couple of grocery items from the garage to the house. She needed to set down a gallon of milk before reaching the kitchen.  Plaintiff could drive only about 6 blocks in town because she experienced pain pressing the gas and brakes, as well as sitting for too long.  (Tr. 58-60)

Dr. Cadiz treated Plaintiff with oral prescription medication and injections.  Plaintiff took 10 prescriptions on a daily basis.  Her newest medication caused dizziness and nausea.  Other medications caused nausea if she did not eat something first.  She was unable to take prescription narcotics because she was allergic to that type of medication.  (Tr. 58-63)

With regard to daily activities, Plaintiff testified that her daughter and husband did the majority of cooking.  Once a week, Plaintiff was able to cook a simple dinner such as soup or

sandwiches.  She was unable to stand over an oven or peel potatoes.  Her family also cleaned the house.  Her daughter vacuumed, and her husband mopped the floors.  Plaintiff could pick up light items and occasionally do a load of laundry.  She was able to go to the grocery store to pick up a few things; however, her husband or daughter accompanied her if she was shopping for a week's worth of groceries.  At the store, Plaintiff used the riding cart because she was unable to walk through the entire store.  Plaintiff could not perform any yard work.  She was able to shower and dress herself, and sometimes she could hold her arms up long enough to use a curling iron.  On a good day, Plaintiff was tired by mid-morning and took a nap.  She then watched TV and fell asleep in the recliner until mid-afternoon.  She napped anywhere from 20 to 40 minutes each time.  Plaintiff testified that she agreed with Dr. Cadiz she would need a half hour of rest for every hour of prolonged sitting or standing, although she did not think she could stand for an hour.  Further, she stated that she did not leave her house often because she did not want to cry in public, and there was not much to do in De Soto during the day.  (Tr. 63-65)

Plaintiff did not feel she could return to any job she performed in the past because she could no longer remember things, and trying to read and learn was difficult.  Physically she was unable to do those jobs because she did not know what pain level she would experience each day.  Of her past jobs, her part-time position at the YMCA was the least stressful and demanding job.  However, she could no longer perform that job because she had to give tours of the facility and use a computer program to handle payroll.  Plaintiff further stated she had a short fuse with the public and that she did not like crowds.  In addition, she was unable to handle stressful situations with superiors and would likely tell them to jump off a bridge if they were upset.  The only job Plaintiff felt she could do was one where the employer was flexible and allowed her to come to work only if she felt okay.  In

6

addition, her inability to remember things would cause a problem.  Although Plaintiff always held important jobs in which people relied upon her, she stated that her combined mental and physical condition was getting worse.  She stated that Dr. Cadiz and Ms. Patton were working together with regard to Plaintiff's diagnoses and prescription treatment.  (Tr. 66-70)

Upon further questioning by the ALJ, Plaintiff testified that Ibuprofen helped to allow her to dress and walk, but the pain never went away.  Her primary care physician, Dr. Cadiz, prescribed the psychotropic medications, as Plaintiff was not seeing a psychiatrist.  Plaintiff saw Ms. Patton for counseling.  (Tr. 70-71)

Brenda Young, a vocational expert ("VE"), also testified at the hearing.  Ms. Young stated that Plaintiff's past work as a customer service representative was classified as sedentary and semiskilled work, while her job as an executive director of the chamber of commerce was sedentary and skilled.  In addition, the office manager's job was classified as skilled and sedentary, although the work was light and semiskilled.  Plaintiff's temporary clerical jobs were semiskilled and sedentary to light.  Ms. Young noted that some of Plaintiff's executive administrative positions were performed at the skilled level and ranged from light to sedentary.  (Tr. 71-73)

The ALJ then asked Ms. Young to assume a hypothetical individual of Plaintiff's age, education, and work experience.  The individual was limited to light work; required a sit/stand option every hour but remains on task; could use foot-controlled operations occasionally, was unable to climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; could never crawl; should avoid all exposure to moving machinery, unprotected heights, and hazardous machinery; and could only occasionally interact with the public.  Given this hypothetical, the VE testified that the individual would be unable to perform her past relevant work because Plaintiff's jobs were performed at the

7

skilled level and higher end of the semiskilled range.  However, there were other jobs in the national and local economy which the individual could perform in the light work category.  Such jobs included small product assembly positions and file clerk positions.  (Tr. 73-75)

In a second hypothetical, the ALJ asked the VE to assume the same individual but limited to a complete inability to use any foot control operations.  This person could only occasionally make decisions or tolerate changes in a work setting.  Given this hypothetical, the person could still perform the previously mentioned jobs.  If the individual required a sit/stand option every 30 minutes with no interaction with the public, the assembly and file clerk jobs would still remain.  In addition, the individual could perform sedentary assembly jobs.  However, if the person had to leave her work station at any time to walk around or took more than the allotted breaks, no jobs would be available. (Tr. 75-77)

Plaintiff's attorney also questioned the VE and added limitations including weakness and limited motion in the individual's shoulders, as well as paresthesis of her fingers, which occasionally affected grip and motor strength.  The VE responded that those limitations would eliminate the assembly and file clerk jobs.  In addition, she would not be employable if she missed an average of 3 days a month due to illness.  (Tr. 78-84)

In a Disability Report, Plaintiff stated that she was unable to work due to neuropathy in both legs, chronic fatigue, malabsorption, low B12, sarcoidosis, memory fog, angina, irritable bowel syndrome, migraines, hypertension, constant shooting pains, burning sensations, and numbness in both legs.  She stated that she could not sit for more than one hour or stand for more than 15-20 minutes.  She stumbled and lost balance when walking, and she had problems typing due to joint pain.  Plaintiff further reported an inability to recall instructions.  Some days she could not get out of bed

due to pain.  Fatigue made it impossible to do more than shower and get dressed.  Plaintiff stopped working because of her condition.  (Tr. 149-50)

In a Function Report – Adult dated December 26, 2008, Plaintiff described her daily activities as showering and dressing, sometimes cooking, resting in bed, moving to recliner to read or watch TV, taking a bath, putting on PJ's, and going to bed.  Her husband and daughter did laundry, grocery shopped, picked up house, and did 90% of the cooking.  Plaintiff could sometimes fix a sandwich or microwave a meal.  She occasionally loaded the dishwasher and swept the floor.  She shopped for prescriptions and groceries as needed.  She socialized with others and tried to attend church weekly. (Tr. 181-88)

### III.  Medical Evidence

From January to September of 2008, Plaintiff was treated at the Draves Family Practice. Plaintiff primarily complained of cold symptoms.  Her sarcoidosis was under control.  (Tr. 211-15)

On November 4, 2008, Plaintiff began treatment with Dr. Briccio Cadiz M.D.  Plaintiff complained of chest pain/palpitations; pain in her left arm with walking; shooting pain in her legs and feet; muscle pain and weakness; constant fatigue; and sleep disturbances.  Dr. Cadiz assessed suspected mitral valve prolapse; elevated platelets; sarcoidosis[1];fatigue; B12 deficiency;  and neuropathy. (Tr. 282-83) On that same date, Plaintiff underwent blood testing, which was highly suggestive of primary hyperparathyroidism.  (Tr. 237-38)  Tests performed on November 6, 2008 revealed left atrial enlargement, mild pulmonary hypertension, reversal of E to A ratio, and estimated ejection fraction of 65-70%.  (Tr. 241-41)

---

[1]  define this.

9

On December 16, 2008, Plaintiff reported that she felt better and was sleeping better. However, she still had some leg discomfort and a lot of fatigue. Dr. Cadiz assessed B12 deficiency; hypertension; fatigue; and fibromyalgia trigger points at elbows, neck, low back, and knees. (Tr. 281-82)

Plaintiff returned to Dr. Cadiz on January 20, 2009 for a follow-up visit. She reported feeling better and more alert. Dr. Cadiz assessed B12 and vitamin D deficiencies, fatigue, subclinical hypothyroidism, and hypertension. (Tr. 280-81) During an April 21, 2009 appointment, Plaintiff complained of pain in her legs and feet, especially at night. She also reported feeling better. Physical exam revealed an abnormal cardiac tachycardia, abnormal reflexes, and an abnormal sensory exam. (Tr. 279-80)

On March 27, 2009 the Plaintiff began treatment with Robin Patton, a certified therapist at Ray of Hope Counseling. Plaintiff reported trouble sleeping, pain in both legs and feet from neuropathy and fibromyalgia, and physical fatigue. She also stated that she was easily angered and depressed because of pain and that she was stressed due to an overbearing mother. Ms. Patton noted that Plaintiff was talkative, pleasant, anxious at times, neatly dressed, tearful, and depressed and sad. Ms. Patton worked with Plaintiff on positive thinking methods and relaxation techniques and planned to continue support. (Tr. 267)

On April 24 and May 28, 2009, Plaintiff was talkative, pleasant, anxious at times, and tearful, with good eye contact. Ms. Patton noted that Plaintiff was dealing with physical ailments and issues with her mother. (Tr. 268-69) On June 26, 2009, Plaintiff could not walk one flight of stairs to Ms. Patton's office, so they met on the ground floor. Plaintiff had packed a picnic for her daughter's birthday party, which had been too much for her. Plaintiff reported being tired of dealing with her

illness.  She was not as talkative as usual.  (Tr. 270)

On July 17, 2009, Plaintiff returned to Dr. Cadiz for a regular check up and to follow up on blood work.  She complained of pain in her legs and down both arms.  Physical examination revealed abnormal findings with regard to strength, range of motion, and stability.  Dr. Cadiz noted trigger points in Plaintiff's legs, shoulder, and arms, as well as decreased temperature in her lower legs.  Dr. Cadiz assessed vitamin D and B12 deficiencies, hypothyroidism, questionable fibromyalgia in her upper arms, and sarcoidosis.  (Tr. 279)

Robin Patton noted on August 28, 2009 that the Plaintiff was again unable to walk the flight of stairs to Ms. Patton's office.  Plaintiff was upset, tearful, and anxious.  She recalled the sexual molestation that she suffered as a small child from a family member.  Plaintiff further reported that she did not go shopping because she could not control her tears and did not want to be embarrassed. Plaintiff was taking her husband's Paxil, and Ms. Patton advised her to see her physician to get her own prescription antidepressant.  Ms. Patton also noted that Plaintiff was in obvious pain and was limping.  (Tr. 271)

On September 25, 2009 Ms. Patton noted that Plaintiff was able to climb the stairs and that she was doing "a little better emotionally."  Plaintiff's anxiety attacks had subsided with medication. Plaintiff was talkative and appropriately dressed, with good eye contact and an obvious limp.  (Tr. 288)

Plaintiff presented for a regular check up with Dr. Cadiz on October 16,  2009.  She complained of continuing pain in her feet and in her legs.  She also reported seeing a counselor, Robin Patton, for anxiety issues and also reported a diagnosis of post-traumatic stress disorder ("PTSD") and depression.  Plaintiff described her pain as tingling, shooting, jerking, and aching.  Physical

examination revealed abnormal range of motion and abnormal sensory exam with decreased sensation, temperature, and vibration in her legs.  Dr. Cadiz assessed hypertension, PTSD, neuropathy, fibromyalgia, and vitamin D deficiency.  (Tr. 278-79)

Ms. Patton opined in a medical source statement dated December 17, 2009 that Plaintiff had marked limitations in her ability to understand, remember, and carry out simple instructions; understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions.  Ms. Patton explained that Plaintiff's memory was impaired such that she understood instructions but forgot commands and became confused before completing tasks. She also noted mood disorder due to general medical condition and delayed onset of PTSD.  Ms. Patton opined that Plaintiff had  a marked inability to appropriately interact with the public based on depressed symptoms, decreased interaction with friends and family, loss of interest in activities, anxiety, crying spells, and a short temper. Further, Ms. Patton reported that she observed Plaintiff having difficulty walking, climbing stairs, and sitting due to pain in legs and back. (Tr. 264-266)  In a letter dated December 22, 2009, Ms. Patton opined that Plaintiff was unable to return to work because of her physical and mental impairments.  (Tr. 263)

On December 29, 2009 Dr. Cadiz completed a medical source statement indicating that the Plaintiff suffered from fibromyalgia, neuropathy, sarcoidosis, vitamin B12 deficiency, vitamin D deficiency, fatigue, insomnia, weakness, multiple trigger points, and multiple joint pains.  Dr. Cadiz opined that during an 8 hour work day, Plaintiff could walk less than an hour, stand less than an hour, and sit for less than an hour.  He further opined that Plaintiff's ability to lift, hold, carry, or manipulate objects or use her upper extremities was impaired due to weakness and limitation of motion in her shoulders, as well as parasthesis of the fingers effecting her grip and motor strength. In addition, Dr.

Cadiz stated that Plaintiff could frequently lift and/or carry up to 10 pounds, could occasionally lift 10 to 20 pounds, and could never lift 20 to over 50 pounds. Plaintiff was restricted in climbing stairs or ladders and in bending. Further, Dr. Cadiz opined that Plaintiff would require 30 minute rests for every hour of prolonged sitting or standing. Plaintiff's limitation of motion, fatigue, and pain caused depression and anxiety. He believed that her multiple joint pains and fatigue severely impaired her activities such that she was incapable of performing at least the full range of sedentary work. He further stated that she was unable to work an eight hour day five days a week. Dr. Cadiz opined that Plaintiff's reports of pain are credible because trigger points were reproducible and consistent. He did not expect improvement in Plaintiff's condition. (Tr. 284-286)

Plaintiff returned to Dr. Cadiz on January 4, 2010, complaining of leg and foot pain, increased fatigue, and trouble walking. She also reported switching between ibuprofen and naproxen because both caused GI bleeding. Physical examination revealed abnormal strength, range of motion, stability, and inspection. Dr. Cadiz noted tender muscle points in shoulders, hips, thighs, and worst on calves. Her sensation was intact. (Tr. 276)

On March 8, 2010, the Plaintiff reported to Dr. Cadiz that medication had helped her pain, which was less frequent but had not subsided. She was still able to function. Physical examination was normal, other than abnormal tachycardia. Dr. Cadiz assessed fibromyalgia, right eyelid mole, impaired vision, hypothyroidism, vitamin D and B12 deficiencies, depression/anxiety, and chest pain. He referred Plaintiff to a plastic surgeon and noted symptoms of loss of motion in her fingers, swollen hands and joints, and decreased sensation in her toes. Dr. Cadiz also recommended a psychological consultation. (Tr. 314-15)

On April 8, 2010 the Plaintiff saw Dr. Natajaran Laks of Advanced Psychiatric Services.  Dr. Laks diagnosed major depressive disorder, recurrent and PTSD.  Dr. Laks prescribed Cymbalta and Paxil.  (Tr. 317-320)  Plaintiff followed up with Dr. Laks in May 2010.  (Tr. 321)

Plaintiff saw Dr. Hamid Bashir on May 10, 2010 for complaints of multiple joint pains, tingling in the feet, widespread muscle aches, fatigue, and shortness of breath. Physical exam revealed normal gait, motor strength, reflexes, and sensation.  Dr. Bashir also noted tenderness over both shoulders, multiple fibromyalgia trigger points in symmetric distribution, and tenderness over the toes and right ankle.  Plaintiff's affect and speech were normal.  Dr. Bashir diagnosed joint pain in multiple sights, sarcoidosis, and fibromyalgia.  (Tr. 305-307)

On June 8, 2010, Plaintiff returned to Dr. Cadiz for a 3 month check up. Dr. Cadiz noted that Plaintiff's sarcoidosis was out of remission, and he recommended an MRI of the brain.  (Tr. 299-300) A lower extremity arterial study on June 14, 2010 revealed significant small vessel disease of the feet bilaterally, with borderline significant disease in the thighs bilaterally and across the knee on the left. (Tr. 303)  An MRI of the brain performed on that same date revealed a focus of enhancement along the tentorium on the left with a small enhancing mass lesion which was a concern.  (Tr. 302)

### IV.  The ALJ's Determination

In a decision dated February 22, 2010, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.  She had not engaged in substantial gainful employment since her alleged onset date, October 1, 2008.  The ALJ further determined that Plaintiff had the severe impairment of fibromyalgia.  The ALJ noted that Plaintiff had not been diagnosed with depression or anxiety by any acceptable medical source and therefore failed to sustain her burden of proving a medically determinable mental impairment.  In addition, no

14

objective findings supported Plaintiff's diagnosis of sarcoidosis.  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 10-11)

After considering the record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with a sit/stand option every hour.  Further, she was unable to use her lower extremities to operate foot controls; unable to crawl or climb ladders, ropes, or scaffolds; and able to occasionally climb ramps or stairs.  Plaintiff needed to avoid operational control of moving machinery, working at unprotected heights, and exposure to hazardous machinery.  Finally, she was limited to jobs that involved only simple routine and repetitive tasks with occasional decision making, occasional changes in the work setting, and no interaction with the public.  The ALJ assessed Plaintiff's testimony and found that her allegations of were not entirely credible.  The ALJ also noted that treatment records prior to her alleged onset date were inconsistent with allegations of disabling fibromyalgia, leg pain, neuropathy, fatigue, and sarcoidosis.  Further, Dr. Cadiz's medical source statement was inconsistent with treatment records and were unsupported by objective testing.  In addition, no physician recommended that Plaintiff stop working, and treatment notes indicated that she was doing better.  (Tr. 11-15)

The ALJ determined that Plaintiff was unable to perform any past relevant work.  However, in light of her younger age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform such as sedentary assembly and file clerk.  Thus, the ALJ concluded that Plaintiff had not been under a disability from October 1, 2008 through the date of the decision.  (Tr. 15-17)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence,

16

the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If inconsistencies in the record and a lack of supporting medical evidence

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI.  Discussion

In her Brief in Support of the Complaint, Plaintiff argues that the Commissioner failed to consider evidence submitted to the Appeals Council subsequent to the ALJ's decision.  In addition, she asserts that the hypothetical question presented to the VE did not contain all of Plaintiff's limitations, specifically her upper extremity restrictions and her need for additional or longer breaks. Defendant, on the other hand, maintains that the ALJ properly discounted the opinion of Plaintiff's treating physician and properly determined that she had the RFC to perform a limited range of work at the light exertional level.  Further, the Defendant contends that the Appeals Council properly denied Plaintiff's request for review.

The undersigned finds that substantial evidence supports the ALJ's decision and that the Commissioner did not err in refusing to consider evidence submitted after the ALJ issued the determination.  Further, the hypothetical posed to the VE contained all of Plaintiff's credible limitations, such that substantial evidence supported the ALJ's determination.

## A.  New Evidence

Plaintiff first contends that the Appeals Council should have considered newly submitted evidence.  "In order to support a remand, new evidence must be 'relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (quoting Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997)).  Further, there must be a reasonable likelihood that the evidence would have changed the determination. Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993).       "Where, as here, the Appeals Council

18

considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citations omitted).

The Defendant correctly notes that the evidence submitted pertains to examinations after the date of the ALJ's February 22, 2010 decision.  Only one examination by Dr. Cadiz took place during the relevant time period, and the other visits with Dr. Cadiz, Dr. Bahir, and Dr. Laks took place after the ALJ issued his decision.  (Tr. 289-312, 313-21)  The record shows that the Appeals Council did consider this additional evidence and determined that the information did not provide a basis for changing the ALJ's decision.  (Tr. 1-2)

With regard to Dr. Bahir's report, the undersigned notes that he examined Plaintiff one time. Generally, the report of a consultative physician who examined a plaintiff on only one occasion does not constitute substantial evidence based on the record as a whole.  Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (citations omitted).  Further, this report was merely cumulative of reports from Plaintiff's treating physician and would not have changed the outcome of the ALJ's determination. The new evidence also shows that Plaintiff saw a psychiatrist, Dr. Laks, in April and May of 2010. Again, these reports merely re-state previous diagnoses and do not present new and probative information.  Finally, Dr. Cadiz's treatment records from January to June of 2010 show problems with Plaintiff's legs and feet, the ALJ took these problems into account when assessing Plaintiff's RFC.  Indeed, the ALJ included the restrictions of a sit/stand option and an inability to operate foot controls.  With regard to the brain MRI, the test conducted four months after the decision was uncertain.  (Tr. 302) Further, Plaintiff fails to demonstrate that this issue relates to her condition

19

during the relevant time period.  Thus, the undersigned finds that none of the evidence submitted by Plaintiff subsequent to the ALJ's determination supports remanding this case to the Commissioner.

## B.  Hypothetical to the VE

Next, Plaintiff argues that the hypothetical question posed to the VE was incomplete in that it did not include upper extremity limitations or the need for longer or additional breaks.  The Defendant responds that hypothetical question properly included only those impairments and restrictions that the ALJ found credible.

The undersigned agrees that the ALJ posed a proper hypothetical question to the VE and that the VE's testimony that Plaintiff could perform work was substantial evidence in support of the ALJ's determination.  "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Further, where substantial evidence supports an ALJ's finding that a plaintiff's complaints were not credible, the ALJ may properly exclude those complaints from the hypothetical question.  Id.

In the instant case, the ALJ included only those impairments and limitations that he found credible.  The ALJ asked the VE to assume an individual with Plaintiff's education, training, and work experience, who could work at a light exertional level.  (Tr. 775)  The ALJ also included the credible limitations, including a sit/stand option every hour; no use of foot-controlled operations; inability to climb ladders, ropes, or scaffolds; ability to occasionally climb ramps or stairs; inability to crawl; and avoidance of all exposure to moving machinery, unprotected heights, and hazardous machinery.  The ALJ also included mental limitations such as the ability to occasionally interact with the public; ability to occasionally make decisions or tolerate changes in a work setting; and need for jobs involving only

20

simple routine and repetitive tasks.  (Tr. 11, 73-75)  These limitations are consistent with medical and other evidence in the record.  Indeed, Plaintiff acknowledges that she agrees with each of the limitations set forth in the RFC finding with the exception of a need for longer breaks and an upper extremity limitation.  (Brief in Support of Complaint 14, ECF No. 22)

Plaintiff's attorney raised these additional limitations when questioning the VE.  However, the evidence does not support these limitations, and the ALJ properly discredited Plaintiff's allegations.  "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).  However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted).  Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements."  Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

In this case, the ALJ relied on the treatment records of Dr. Cadiz but found these records to be inconsistent with the medical source statement.  Specifically, the ALJ noted that the medical record contained no tests or other objective evidence to support Dr. Cadiz's diagnoses.  Further, the only evidence in the record to support Dr. Cadiz's findings were physical examinations which were fairly normal, not always fully described, and reliant on Plaintiff's subjective reports of symptoms and limitations.  While Dr. Cadiz opined that Plaintiff had extreme functional limitations, he never

restricted Plaintiff's activities or referred her to a specialist or for pain relieving therapy.  Thus, the

ALJ properly discounted Dr. Cadiz's opinions rendered in his reports related to Plaintiff's disability

claim.  See Choate v. Barnhart, 457 F.3d 865, 870-71 (8th Cir. 2006) (finding that ALJ properly

discredited physician's Medical Source Statement where treatment notes never mentioned restrictions

or limitations to the plaintiff's activities).  Further, Plaintiff's complaints primarily involved the lower

extremities.  While there is some indication that after the relevant time period Dr. Cadiz assessed

limited motion in Plaintiff's fingers, as well as swollen hands, her examination was normal.  (Tr. 315)

Nothing in the record supported her allegation of upper extremity restrictions.  In addition, only Dr.

Cadiz's medical source statement opined that Plaintiff required longer or additional breaks.  As

previously stated, because the medical treatment records were inconsistent with Dr. Cadiz's medical

source statement, the ALJ properly refused to give Dr. Cadiz's opinion controlling weight.  See

Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000) (stating an ALJ may discount or disregard a

treating physician's opinion where the "treating physician renders inconsistent opinions that

undermine the credibility of such opinions . . .") (citation omitted).

As such the ALJ was not required to include the limitations in his hypothetical question to the

VE.  Therefore, the undersigned finds that "[t]he hypothetical was sufficient because it represented

a valid assessment of [Plaintiff's] . . . limitations consistent with the evidence in the record."  Davis

v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  Because the hypothetical question properly set forth

Plaintiff's limitations, the VE's testimony constituted substantial evidence upon which the ALJ could

properly rely in determining that Plaintiff was not disabled.  Id.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  26th day of September, 2012.